I don't want to say that it's a subject matter that's emptied out this courtroom, but it may mean something. I don't know. They probably heard me before. Good morning, counsel. Good morning, Your Honor. I'm sorry, Justice Smith. I had an argument before in appellate court at one point where somebody took me to task for referring to them as Your Honor, and if I slip and refer to the court as Your Honor, I appreciate it. That's okay. In the famous line of my late great colleague, Betty Fletcher, there is no justice here. We are all judges. Can I use that as an admission, Your Honor? It's a quote. If it pleases the Court, I'd like to have approximately, given the fact that the Court has been asking questions on the last few appeals, and I'm hoping that the Court will ask a lot of questions on this appeal, too, about four minutes. And I'll keep my eye on the timer here. But if I get – if anybody notices I'm beyond, like, four minutes, would they please? We'll let you know. Thank you very much. You're not a law student. I was asked that as I walked in. I thought maybe somebody was making a comment that would be taken as an approach. Well, I hope that you will start out by explaining who the parties are in this case. Yes, I will. Thank you, Your Honor. What the parties – the parties who are the appellants and the plaintiffs in this case are an extended family who rented a charter bus back in – I think it was – let me get my notes here – back in 2007 in August. And the idea was that this extended family was going to be taking a trip around the Southwest. This was not a standard coach. This had been modified so that it was one of those real fancy ones. But it was a full-size bus. They rented – they chartered this bus from a company called Five Star, which was a DBA for a corporation, a California corporation called MUH. Okay. So on this trip, they lose the front right tire for a number of reasons, which resulted in my naming the manufacturer as a defendant in the underlying case. And the bus is pulled off the side of the road into a tree on a freeway. And everybody gets injured – not everybody, but most of the – What was the tree doing on the freeway? They probably don't have the Caltrans approach to objects on the side of the freeway. But this was an interstate, so the Department of Transportation should have had something to say about it. But the bus struck the tree with such force that it actually uprooted this tree, which looked to be about 40 or 50 years old at least. And at any rate, they were all – most of the people on the bus, with the exception of two, were injured. The reason you have all of the different names as plaintiffs is because they're in-laws and you have daughters of the main family, that kind of thing. Okay. So the plaintiffs are all the people on the bus, or they're representatives? There are all the people on the bus. There's nobody that died as a result of this, thank God. So we don't have any representatives, no estates, or anything like that. Nobody has died yet, even though it's been 10 years. And I keep my fingers crossed. Okay. Now, MUH was represented by its insurer? No. That's the whole point here. The whole point is that in 2008 when this accident happened – I mean, 2008 when we filed the complaint, a little bit less than a year after the accident happened, MUH tendered the complaint. It had two policies of insurance with an insurance company by the name of Lincoln, or Lincoln General. And Lincoln declined coverage. And they had a commercial auto policy and they had a CGL policy. Then later on, in 2011, after the complaint had been amended, we had taken the depositions of the people involved to find out what was going on here, because the relationship was a little byzantine. But we found out through the depositions we amended the complaint, and that was again tendered by MUH to its insurance carrier in 2011. In 2012, we had a trial date coming up, and they again tendered, because there was some question as to which policy had been tendered in 2011. In all such cases, they were tendered to the same people and they got the same response. This is where I'm confused. Was that tendered to Lincoln? It was tendered to – well, as it turned out, it was tendered to ProGlobal, because the people that had been working for Lincoln in 2008 who denied coverage were taken over by ProGlobal. All of the employees of Lincoln were assumed by ProGlobal in 2009, pursuant to this joint venture agreement, which is why the parties in this case are so hard to put a finger on. But, Counsel, like my colleague, the facts of these are quite convoluted. You've got Lincoln, there's a receivership or a trusteeship in Pennsylvania, one of the conditions of the procedure there is you have to waive any claim you had. You did that, but now you're coming back against these three entities, as I understand it, which are Walshar, which I understand is a Pennsylvania corporation doing business in Pennsylvania. You've got ProGlobal, the public limited company under the laws of England and Wales, and you have LGIC Holding, which is a Delaware corporation, which in principle plays a business in Pennsylvania, and no California members. So what I'm struggling with anyway is how in the heck do you get specific personal jurisdiction over any of those three people? Before you get there, who are they? Who are they? ProGlobal is – we've described it in – as you can see, by the way, the second amended complaint is organized. I have various sub-paragraphs to paragraph four. And the reason I did that was I wanted to keep all of the allegations about the three new defendants in one place. And then what we came up with was the following. ProGlobal, its predecessor, entered into what's called a runoff agreement, which is an agreement that what the carrier is doing is taking the status of the policies that exist at that point and running them off and writing no new business. If you see the second amended complaint in 2010, the Department of Insurance of the State of California forbid Lincoln from writing any more policies. By 2014, the Department of Insurance of the State of Pennsylvania had placed Lincoln into liquidation. When it gets placed into liquidation, that's when the receivers come in. And so occasionally that doesn't happen, but generally that's what happens. And in this case, it was clearly insolvent. So you had problems. Now, the form that the court was referring to is a form for claims against the entity, Lincoln, in the receivership. It does not purport or say anything at all about claims to anybody else who might be responsible. And nobody has argued that it does. So, but what we have here is a situation where ProGlobal came in to do all of the work of this agency. They created a joint venture by transferring materials back and forth in an extremely complicated situation, as alleged in the second amended complaint, but there is a writing which specifically obligates ProGlobal as part of the runoff agreement and a secondary agreement that was enacted later on to do two things. They have the obligation to perform everything under the insurance contracts that exist, and they have the obligation to pay all of the... Under the contracts between... MUH and Lincoln, and all of the Lincoln contracts in the United States, pretty much. I think there were two exceptions, but, and so you have situations like we have in this case, where we go through the process of going and getting a binding arbitration, getting an award, at which point you have the creditors, the plaintiffs in the underlying case, have a direct right of action underhand in 11-580 of the insurance code, and the MUH folks have, as is common in the State of California, assigned their rights under the insurance contracts to these creditors in return... Is there a written document that does what you just said in terms of an assumption of the runoff? My understanding is there is. Now, we were not allowed any... Information and belief, right? Well, yes, Your Honor, and as I'm sure you're aware, information and belief is a time-worn way of pleading things when you don't actually have access to the information. But it is a problem for jurisdiction, is it not? That's what I'm struggling with, is how in the heck do you get jurisdiction, specific personal jurisdiction in California over these folks? Not that if you were in a proper jurisdiction, you wouldn't have a claim against them. Justice Smith, I'm going to answer that question. I still don't understand, so who are these entities? So we have these three people who are in a joint venture, basically, we allege, and this part of it is based upon pleadings that were filed in the state of Pennsylvania and the state of New York, as well as the pleadings filed by the California Department of Insurance. So although I'm not allowed to do any formal jurisdictional discovery, or for that matter, any discovery with respect to these three folks at all, I have been able to get information from these sources. But these people took over essentially the business of Lincoln. They're doing everything. They're doing the claims handling, they're doing the receiving, they're doing everything. What's your information about their contacts with the state of California? Well, we know that they did, if I can, with respect to both claims here, which is tort and contract. We have two versions. We have a contract claim based upon the MUH being a party to the original insurance contract. We have a tort claim based on that, and we have a contract claim based upon the fact that as judgment creditors, the plaintiffs in this case, the appellants, have a contract relationship with the insurer. And then we have a bad faith claim based on the fact that they never paid what they should have paid to the judgment creditors. Aside from that, do you have any history of these three companies doing business or being involved in the state of California? Yes. What we have is, and I attached it from the discovery we did get, I attached some excerpts to my declaration, which was filed in opposition, which is at supplemental excerpts of record, my declaration starts at 71, and the last three pages, which I think, no, it's a little bit more than that, from supplemental excerpt 79, and I have it highlighted. And what that basically is, is that's the testimony of the person most qualified that was produced at a PMK or PMQ deposition for Lincoln. That individual testified, if you look at it, that there was another person and that ProGlobal took over the entire operation, and I think you said two and a half to three years before that declaration was taken, which fits into the 2009-2010 time period. But as you know, as you know, under Walden, under Axiom Foods, it isn't what the interaction with individuals or, indeed, companies, it's what the action was with respect to the state of California. Exactly. And I don't see that. Where is it? Oh, okay. Let me continue. Because that is the claims handling with respect to these two policies. Those are the two individuals who were charged with claims handling, making decisions about the tender, making the decisions about whether or not to accept the defense, making the decisions about whether to pay the claims, making decisions about what they needed to instruct the people that were representing them in the federal case. And remember, we filed that subsequent case in federal court. So that is definitely a connection to the state of California. Did they file something with the insurance commissioner saying they were going to do that? Well, Lincoln is the titular head of the organization. I get that. And you have now dismissed them in connection with the liquidations in order to get whatever you got from that. You're going after the other people in hopes you're going to get some more. I'm not happy to report to you that my claim in the liquidation has been declined and that SIGA is now involved, the California Insurance Guarantee Association. But the point is that we have an insurance carrier who is ‑‑ I'm sorry, John. You're almost over your time. It's up to you. I prefer to make the point that it is this. You have highly regulated by the state of California insurance policies that are in place. You have provisions in the insurance policy required by the federal government with respect to these types of buses. You have the communications between the pro‑global people, which were the adjuster types, with people in California. You've got letters to the insured in California. You've got communications with us in California when they come back. We filed the case in California. They appeared in California. All with respect to Lincoln. But at the time they were running Lincoln and they had a written joint venture agreement with Lincoln, which was different than what you would ordinarily see. Because normally you see a management agreement where somebody agrees to do this. This was different because in a management agreement the company that's hired to manage it is not responsible for paying the benefits under the policy usually. In this case they were expressly responsible. They had another unique element, which was everything they saved from the reserves was split between Lincoln and its joint venture. The employees of the joint venture, which were the claims adjusters, were the ones that were handling all the claims in California. They were the ones that denied it. They were the ones that refused to pay any benefits. So you have those connections for sure. In addition, you have to pay somebody to appear in these things. So there's payment to lawyers to appear in California. They invoke the jurisdiction of the U.S. District Court in California when they filed a third-party complaint against MUH, who was not a party to the underlying case. And how far am I over now? 18 seconds. Let me ask my colleague the other question. Just quickly, so you're basically arguing that these three entities are stepping in the shoes of Lincoln, and because Lincoln was involved in California, they're involved in California. Well, they expressly agreed to assume responsibilities on these claims in California. With respect to a California resident. You allege, based on information of belief. No, not that one. That one isn't based on information of belief. So they agreed that they would be subject to personal jurisdiction in any situation in which Lincoln would have been subject to personal jurisdiction? I think in effect, because where they're doing the business of Lincoln, they're performing the obligations under a contract, in this case with a California resident. And they're supposed to be performing the obligations under the contract with the resident. And I believe under Schwarzenegger and Lake versus Lake, that's where, you know, that's what the criteria is. This is not a situation like the Neon case, where you've got a company in the Netherlands, and everything happens over there, and they're trying to, that's a general jurisdiction case. This is a special jurisdiction case, special personal jurisdiction case. Other questions? Your Honor, could I impose on you to have a minute? I apologize, but you're well over your time, and we thank you for your presentation. Thank you, Your Honor. Good morning, counsel. Good morning, Your Honor. May it please the Court, David Allen on behalf of Appalese, Walshire, LGIC Holdings, and ProGlobal. If I may, I'd like to address some of the things that were argued first, and that is the allegation or the contention that plaintiffs specifically alleged facts, facts to establish that my clients assumed the liabilities for Lincoln General. I think what they're referring to is found in Excerpts of Record 79 at paragraph 3, and in that allegation of the complaint, plaintiffs allege everything but the kitchen sink. They allege that we were all agents of one another, that to the extent that we were not agents of one another, that we were principals of one another, and that we ratified everything that everybody had done, and by the way, we had assumed the liabilities. There are no facts to support that. There is no contract to support that. It's just a conclusory allegation. This Court should affirm we submit the District Court's judgment dismissing the case for lack of personal jurisdiction. Plaintiffs cannot, cannot get past the hurdle of Williams v. Yamaha Motor. Absolutely. You'll find in Excerpts of Record 81 and 82 and page 84, it's paragraphs 4C, E, L, and M. Lincoln was the immediate, was wholly owned by Walshire. Walshire in turn was wholly owned by LGIC Holdings, and the ultimate parent was Pro Global. From the allegations of the complaint, specifically in Excerpts of Record 82, paragraph 4H, my clients in Lincoln General entered into this so-called runoff agreement. Lincoln General was in difficult times, and under that they agreed that Pro Global would process the claims on behalf of Lincoln General. It started out as a voluntary runoff, and then ultimately Lincoln General's financial situation deteriorated to such an extent that the Pennsylvania authorities stepped in and shut them down. And the agreement started in what year was that? 2009. 2009 was when the alleged joint venture agreement started. And... You call it a runoff agreement. They call it a joint venture. Well, they call it a joint venture runoff agreement, because essentially what Pro Global, which it's not in the records, actually it is in the further Excerpts of Record, the deposition testimony of Mr. Chuck Wilson, Charles Wilson, where he said basically Pro Global was a third-party administrator. Insurance company wrote the policy. Another entity handled the processing of the claims. Yes, Your Honor. Well, it had no so these entities had no connection with Lincoln until 2009? Well, they had been the owners. Yes. Right, right. So they had the corporate relationship with Lincoln. Correct. That's exactly right. But they did not agree to assume any financial responsibilities of Lincoln. They simply agreed to process the claims that Lincoln got to the degree they were assets of Lincoln to satisfy them. That's exactly right, Your Honor. So the position, if I understand it, of the three entities, Walshar, Pro Global, and LGIC Holdings now is, hey, this is a subsidiary. They went out of business. We have no obligation to take care of those. They're trying to sue to get them involved, but their jurisdiction doesn't add up to specific personal jurisdiction from their perspective. That is exactly right. If they had not agreed to undertake the processing of these matters that were pending with respect to Lincoln, what would have been their obligations? Nothing, no more than any other parent corporation to its subsidiary. And if they had not, I suspect that the Pennsylvania state officials would have stepped in that much sooner. So they were just processing claims. But who were they protecting? Weren't they protecting themselves by doing that in some fashion? They were honoring the claims of Lincoln general policyholders, but there's no allegation that they stepped into the role of an insurance company regulated under the laws of the State of California, as Lincoln had been. So the Pennsylvania people would have gone after them. Correct. If they hadn't entered into this agreement. When you say them, Your Honor, I'm sorry. Well, these companies that were the owners of Lincoln, the people that you're representing here. I suspect that the Pennsylvania authorities, their recourse would have been to shut down Lincoln, leaving insureds and policyholders to all file their claims in the Pennsylvania Court of Pleas. Let me say something. I don't think this is in the record, but it would help me understand a little bit better this, in quotes, joint venture concept. While it's true in most business settings that a parent subsidiary relationship, unless there's some unusual things that would put them in a slightly different situation. Such as an alter ego. Alter ego, exactly. There is no liability. But in the insurance business, my understanding has been, particularly with respect to life insurance, that in order to protect the reputation and integrity of the life insurance business generally, that when somebody's about to default, other some companies will come in together to basically make the policyholders whole so as to protect the life insurance business. Now, whether that's right or not, is there any aspect of that in the aspect of insurance we're talking about here, which would suggest that perhaps these parent companies would have had an interest, other than a strictly legal interest, in stepping in to make some of the policyholders whole? I can't think of any. My client's position ultimately would be that there was actually no joint venture agreement in any event. I can't think of any benefits to that. Not quite like the life insurance. No, it's not quite like that. This is policies that were written for trucks and vans and risks of that sort. But getting back to the... Well, I guess I'm still not precisely understanding why they stepped in in Pennsylvania to take over these obligations. Lincoln General had assets. It had policyholders. It had claims made against it. I think perhaps the reason that they stepped in, and it is not specifically in the record, is that the Pennsylvania courts, if a petition for liquidation were to be filed, they would enter a stay. But unlike the Bankruptcy Code, where an automatic stay shuts down everything, nobody can proceed, and we all come to one forum in Pennsylvania and try to reorganize, the state stay is not prohibitive of other proceedings continuing. Some courts will respect it because, out of a matter of comedy, but if they don't, and I don't mean C-O-M-E-D-Y, but as a matter of comedy. But I understand. What I'm trying to get at here is that you stepped in to take over these obligations, and that is essentially the basis, whatever you want to call it, inadequately pleaded, whatever, but that's the basis for the claim here, where the, where these people are left with limited assets in Pennsylvania and they were badly injured. Okay. But I think, Your Honor, the question is, how far did we step in? Did we come in as a third-party administrator and agree, because that's very common in the insurance industry, for there to be third-party administrators who are handling the claims of policies written by an insurance company. Right. And you're saying that that is or is not what their capacity is? That seems to be the capacity of the pro-verbal. What I'm trying to get at is what your position is, I take it, is that they may be responsible and stepped in to take over these claims to protect themselves from what recourse there might be in Pennsylvania, but that didn't make them subject to process here in California. Right. And that did not. And I think even the Second Amendment complaint alleges, like any contract, parties each get something from the contract, pro-global, it's alleged, took over the claims handling in exchange for a percentage of savings in the processing of the claims. It's not stepping in to the responsibility for them. It's a contractual relationship to process the claims. And I just want to be sure, in light of my colleague's question, I want to be sure that what you told me before is still correct, i.e., that when you stepped in to process the claims, you did not agree to assume the financial obligations of Lincoln. None whatsoever. None whatsoever. So when your opposing counsel speaks of a joint venture, that implies almost these are partners, and if one fails, the other is jointly and severally liable. Right. And you are completely disclaiming that. You process the claim, but it's really in a sort of allegorical sense, it's a little bit like being a trustee in bankruptcy. You are processing the claims against the bankrupt estate. Correct. The trustee is not personally agreeing to pay the obligations of the bankrupt estate. Absolutely right. But I take it you might still be, if you hadn't agreed to do that, you might still have been subject to some recourse by folks in Pennsylvania maybe. By the Pennsylvania State officials? Yes. Somebody. Well, then the Pennsylvania State officials would have to proceed under the traditional common law. I do understand. I'm just trying to understand what you're saying. I'm just trying to understand what you're saying. Or alter ego. I understand you're trying to avoid any confession of liability in any jurisdiction whatsoever, but I still am having a little trouble understanding what you agreed to process these claims and you were getting from that agreement some protection from something or some benefit of some sort. We had a contract. That's what they alleged in the Second Amendment complaint. Pro Global entered into a contract with Lincoln General to continue the claims processing. Just like any contracting party. And they were paid? According to the allegations of the Second Amendment complaint, they received a percentage of the savings in the processing of the claims. But. The savings being? Savings. If they were able, if a claim came in and they were able to settle the matter for less than the full amount of the claim, then. They get a. Exactly right. But in any event. In any event. Under Williams. Under Axiom. Walton. There's no jurisdiction. Correct. In California. In this case. To follow up on those claims. Right. By your lights. Right. That's exactly right. That's exactly right. One of the claims made by your opponent is that these companies, particularly Pro Global, was kind of raiding what was left of Lincoln. Is there any merit to that as from what you could see? No, of course not. But to answer the question. What do you know? What were they getting paid? Just out of curiosity. What was. What was. Pro Global. Wilshire. These other three companies getting paid for their work in taking care of the claims of Lincoln. Right. And they were receiving. Perhaps I didn't explain it clearly. But if a claim came in from a Lincoln general insured or a claimant against Lincoln general. Let's do this. Yes. Let's use this case. Because the plaintiffs had gotten an arbitration award of two and a half million dollars. Right. And let's say that Pro Global and Wilshire and the other company came in to settle that claim or resolve it. What would Pro Global get out of that settlement? How would that be handled? Well, let me just answer that two ways. First of all, the only allegation is that Pro Global was involved in that process. There's no allegation that Wilshire or LGIC Holdings was involved in that. But what would they receive? Let's see if it addresses it. I don't think it specifically says in the allegations of the second amendment complaint what they would receive or what percentage they would receive or whether. I see my time is up. Other questions? No. I thank you for the privilege of being able to argue this morning. Thank you. Thanks to you both. I know you both have lots more that you would like to say. You can say good morning. I can say good morning. And we as well. And we thank you very much. I'd like to give him a minute. Okay. In deference to my distinguished colleague, we're giving you a minute. For whom I will be eternally grateful. You should be eternally grateful. Grateful for that. He is a very fine person. Obviously. Indeed. He's allowing me to talk. That's a great thing. Your minute is going. The complaint specifically alleges not that there was any limitation on the obligation to pay the benefits, but that it was open-ended. And the complaint specifically alleges that Walshire, in paragraph 4H, ended up guaranteeing the payment of all of the claims in 2009, which makes this way different than a third-party administrator situation. And the last thing is, this is a pleading-based determination. The fact that counsel doesn't think something, if it's not in the record, it doesn't count. Okay. But even if that's true, even if they stepped in and said, we're going to take over the claim, we're going to pay the claims that are legitimate. They did that in Pennsylvania, didn't they? How does that put them in California? That's a direct, they know that the denial of the claim and the refusal to pay benefits is going to hurt somebody in California, specifically my clients. When they looted this company, and by the way, it's not just a percentage. Okay. So that's sufficient for targeting? Well, they intentionally did this. They knew that if they denied it, this was going to be bad for MUH and bad for us in terms of getting the benefits. The, geez, I just had a thought jump right out of my head. You were thinking, what an outstanding judge. I understand. I had one more point and I forgot it. That's okay. We thank you very much for that. Thanks to both counsel. Have a lovely morning. And again, the case just argued is.
judges: Schroeder, M. Smith, Drain